The MARYLAND.

(District Court, E. D. Virginia. October 20, 1910.)

1. COLLISION (§ 22*)—DEFENSES—INEVITABLE ACCIDENT.

A burdened vessel, which would otherwise be liable for a collision, cannot escape responsibility on the ground of inevitable accident without showing affirmatively that was free from any fault which contributed to the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 19; Dec. Dig. § 22.*]

2. COLLISION (§§ 95, 105*)—VESSELS MEETING IN NARROW CHANNEL—EXCESSIVE SPEED—SUCTION THEREFROM.

The steamer Maryland, passing down the Elizabeth river in the evening, came into collision with the rear one of three barges passing up in tow of a tug; the tow being some 1,600 feet long. The channel was not over 600 feet wide, and the Maryland passed the tug at a distance of not more than 150 feet going at a speed of 15 miles an hour or more. When opposite the tow, she suddenly sheered, causing the collision. *Held*, that she was in fault for passing in a narrow channel at too great speed, and that the sheer was probably caused by suction due to such speed, and not by the breaking of her tiller rope as claimed, and that the defense of inevitable accident was not sustained by the evidence.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. §§ 95, 105.*

With or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit by John H. McNally, master of the barge McNally, against the steamer Maryland. Decree for libelant.

Floyd Hughes and Loyall, Taylor & White, for libelant.
Thomas H. Willcox and Hughes & Little, for respondent.

WADDILL, District Judge. On the evening of January 11, 1910, about 6:40 o'clock, some three-quarters of a mile below Boush Bluff Lightship, in the Elizabeth river, the steamer Maryland, one of the line steamers of the New York, Philadelphia & Norfolk Railroad Company, en route from Norfolk to Cape Charles, Va., collided with the barge McNally, whereof libelant was master, being the rear one of three barges in tow of the tug Reliance, bound from the port of Baltimore to New Bern, N. C. The Maryland was a fast passenger steamboat of 1,369 tons burden, specially built for the important service in which she was engaged. The McNally, an inland coast trade barge of 900 tons burden, had a cargo of about 600 tons of fertilizer, and the tow was some 1,600 feet long. The steamer collided with the barge, striking her on the starboard quarter, causing her at once to sink; the barge and cargo proving a total loss. The respondent concedes that the tug and tow, being incumbered vessels, had the right of way, with the obligation and burden cast upon the Maryland to avoid collision, or the risk of collision; and that, moreover, the burden of proof is upon her to show that the collision occurred without any fault on her part. The respondent does

not question or challenge in any respect the allegations of the libelant as to the navigation of the tug and tow, and, on the contrary, admits that they were in all respects free from fault on the occasion in question, but as a defense sets up the fact that after having duly given the passing signal of one whistle, and receiving a reply thereto from the Reliance, indicating that the vessels would pass port to port, and having under this maneuver safely passed the tug and first barge, and, when about opposite the second barge in the tow, that the Maryland took a sheer to port, running into and colliding with the rear barge; that, upon observing the sheer, the Maryland ported her wheel, and immediately put the same hard aport, but, finding that this did not serve to break the sheer, reversed her engine, and, in short, did everything possible to avert the collision, without avail; that, upon subsequent investigation, it was found that the tiller rope, consisting of a large steel rope 1⅛ inches in diameter, of the most approved kind, placed in the boat at the time of her construction about 2½ years before, had broken, by which the navigator lost control of the steamer, making the accident inevitable; that the rope was new, and procured from one of the best known shipbuilders in the country, and had been regularly and properly inspected; that the accident was thus caused solely from the giving way of this part of its machinery through defects which were not obvious and that could not have been foreseen. The libelant, on the other hand, insists that, before the respondent can interpose the defense of inevitable accident, it must show its freedom from fault in all other respects, and especially must show that the collision occurred as the result of the sudden giving way of the tiller rope, which is claimed to have been the cause of the sudden sheer of the steamer; and they further say that this was manifestly not the real cause of the collision, as there was no unusual strain upon the tiller rope after the steamer had rounded Craney Island Light, and taken her departure down the channel by Boush Bluff Lightship, on a comparatively straight course to the point of the sheer, a distance of some three miles, and that the strain and consequent breaking could not have been caused by the violence of the sheer, but was brought about by other causes in no way connected with the defects in the tiller rope, among them, by suction from the rapid rate of speed at which the Maryland attempted to pass the tug and tow in close proximity, variously estimated at from 100 to 150 feet, or from a possible lump left in the channel when it was shortly theretofore widened from 450 to 600 feet. The libelant, moreover, insists that the speed at which the Maryland was proceeding at the time of the collision, taking into account the width of the channel, the meeting of the long tow, and the further obstruction of the channel by the government dredge engaged at the time in widening and deepening the channel, a short distance below the scene of the wreck, was a distinct fault on the part of the Maryland, sufficient within itself to account for the collision, since upon the Maryland was imposed not only the duty of avoiding the collision, but the risk of the same.

First. The legal questions contended for by the libelant that before the Maryland can escape liability for the collision with the incumbered vessel, because of inevitable accident, she must show freedom from fault on her part may be conceded. If she was in default in the particulars claimed by the libelant, or any one of them, constituting a contributing cause of the collision, she cannot escape responsibility upon the theory of the accident being inevitable. Union Steamship Co. v. New York-Virginia S. S. Co., 24 How. 307, 313, 16 L. Ed. 699; The Colorado, 91 U. S. 692, 703, 23 L. Ed. 379; The Ohio, 91 Fed. 547, 33 C. C. A. 667; The Severn (D. C.) 113 Fed. 578, and cases cited.

Second. We will consider the grounds of objection to the Maryland's navigation on the occasion in question, with a view of determining how far the defense of inevitable accident interposed can apply. Was the Maryland prudently navigated, taking into account the character and then condition of the channel, and the circumstances in which she was placed, when she sheered from her course and collided with the McNally? After mature consideration, the conclusion of the court is that she was not; the channel was a narrow one of only some 600 feet, was obstructed by an unusually long tow coming up as the Maryland was proceeding down the river, and with a dredge engaged in widening the channel just below, and in the immediate vicinity of the collision. Under these conditions, there was no excuse for the Maryland's proceeding at the speed she did, without allowing greater margin to pass the approaching tow ahead of her, and at all events she took the risk of, and must bear the consequences arising from, such navigation. She passed the tug and first barge, within from 100 to 150 feet, at a speed admitted in her answer to be 15 miles an hour, though in her testimony an effort is made to show the speed was not as much as that stated in the answer. The court, however, concludes from the evidence that she was making at least 15 miles an hour, and probably more. At this speed, in a channel of the width in question, with a tug and tow of the length of the one here in such close proximity, there was danger from suction, which suction, caused by the Maryland's high rate of speed, in the judgment of the court brought about the collision. The Ohio, 91 Fed. 551, 33 C. C. A. 667, supra, and cases cited.

The suggestion is also made that there may have been lumps, or unremoved portions of the bottom of the river, not taken away during the widening of the channel, which may have caused the sheering of the Maryland. This may possibly be true, but nevertheless would not serve to relieve the Maryland. The Caldy (D. C.) 123 Fed. 802, 806. Danger, it seems, from a sudden sheer, at or near the point in question, has been encountered by other ships proceeding at a high rate of speed. Whether those conditions may have entered into the cause of this sheer or not cannot be said; but certain it is the Maryland, proceeding at the speed she was going, and passing in close proximity as she did to the tug and tow, took the chances of hazards arising from any unusual or erratic occurrences

possibly liable or likely to occur. The language of Mr. Justice Brown, speaking for the Supreme Court, in the case of The New York, 175 U. S. 187, 207, 20 Sup. Ct. 67, 75 (44 L. Ed. 126) said:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect." The Richmond (D. C.) 114 Fed. 208, 213; The Georgetown (D. C.) 135 Fed. 854, 858.

The defense interposed by the respondent of nonliability for the damages caused on this occasion because of latent defect in her tiller rope will not suffice, under the facts and circumstances of this case. The breaking of the tiller rope was not, in the judgment of the court, the cause of the Maryland's sheer, as there was nothing in the steamship's course, on which she was and had been navigating, after rounding Craney Island Light, some three miles above the scene of the accident, to impose any special strain upon it, nor was there any unusual strain thereon, in shaping her course around Craney Island Light and down the Boush Bluff course.

As viewed by the court, the breaking of the tiller rope, assuming it had relation at all to the Maryland's sheer at the time of the collision, was because of the sudden strain placed upon it in the effort to check the steamer's sheer from other causes, and not from the sudden parting of the tiller rope.

It follows, from what has been said, that the collision in this case was caused solely by the fault of the Maryland, and a decree may be entered so ascertaining.