THE HOWARD REEDER. THE COLUMBIA. THE ELIZABETH E. VANE.

(Circuit Court of Appeals, Fourth Circuit. July 8, 1913.)

No. 1,114.

1. COLLISION (§ 95*) — STEAMER AND MEETING BARGE IN TOW — EXCESSIVE SPEED.

The steamship Columbia, while passing down the Brewerton Channel from Baltimore at night, came into collision with and sank a barge passing up in tow of a tug. An agreement for passing port to port was made when the vessels were a mile or more apart, and the steamship went to starboard, but kept her speed of 12 knots almost until collision, which was caused by her sudden sheer, from running too close to the edge of the channel, or some other cause not clearly shown. The channel was 600 feet wide, and the tug and tow were about the center. *Held* that, whatever started the sheer, the real cause of the collision was the excessive speed of the steamer, and that, being the burdened vessel, with ample room to keep out of the way of the tow, she could not avoid sole liability by charging the tug with minor faults.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 90*) — STEAM VESSELS MEETING IN CHANNEL — STARBOARD HAND RULE.

Article 25 of the Inland Rules (30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which provides that "in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel," does not state an absolute requirement, so as to warrant one of two meeting vessels in acting on the assumption that she is entitled to the full half of the channel on her starboard side.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 181–186, 196; Dec. Dig. § 90.*]

Appeal and Cross-Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty for collision by Frederick Hale, master of the barge Elizabeth E. Vane, against the steamship Columbia, the Chesapeake Steamship Company, claimant, and the tug Howard Reeder, brought in under admiralty rule 59 (29 Sup. Ct. xlvi). Decree against the Columbia and the Howard Reeder, and their claimants appeal. Reversed, and decree directed against the Columbia alone.

For opinion below, see 195 Fed. 1000.

This is an appeal and cross-appeal from a decree of the United States District Court for the District of Maryland, in admiralty, rendered on the 11th day of April, 1912, and involves the damages arising from a collision between the steamship Columbia and the barge Elizabeth E. Vane, in tow of the steam tug Howard Reeder, that occurred in the waters of the Patapsco river on the 19th day of October, 1911.

The facts are briefly that on the evening of the day in question the tug was proceeding up the Patapsco river, towing the barge Vane en route from Port Deposit, on the Susquehanna river, to the harbor of Baltimore, loaded with a cargo of 550 tons of crushed stone, for the purpose of subsequently completing

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
207 F.—59

her tow for Hampton, Va., and when about opposite buoy 26 in the Brewerton Channel, the barge came into collision with the steamship Columbia, one of the passenger steamers of the Chesapeake Steamship Company, en route from Baltimore to Norfolk. The Vane was a wooden barge 178 feet 9 inches long, 23 feet 7 inches wide, laden as aforesaid, in tow of the Reeder on a hawser of 75 fathoms, and was at the time of the collision making between 5 and 6 miles an hour. The Columbia was a fast passenger steamer of 287 feet over all, 46 feet beam, gross tonnage 2,500, and making about 12 knots an hour, having a draft at that speed of about 16 feet 4 inches. The steamer struck the barge on her port side some 20 feet abaft of the beam, cutting deeply into and largely tearing off that side, causing her to quickly sink, resulting in a total loss of the barge and cargo. The Columbia was uninjured, and the Reeder sustained no injury save the breaking of her hawser.

The libel was promptly filed by the owners of the barge against the Columbia, which in turn answered bringing in the tug Reeder under the fifty-ninth admiralty rule, and the latter thereupon filed its cross-libel against the Columbia. The lower court heard the testimony, most of which was taken before the court orally, though some was by deposition, and made its finding of facts and rendered the opinion found in 195 Fed. 1000, holding the Vane free from fault, and the Columbia and the Reeder both in fault, and divided the damages between them. From this decree the Reeder and the Columbia appealed.

The faults assigned by the Reeder against the Columbia are, briefly, that she failed to direct her course so as to avoid the Vane, that she failed to keep a safe distance from the Vane, that she failed to observe the rules requiring the ship to keep to that side of the channel on her own starboard side, and that she failed to avoid collision with the barge as she was proceeding up the Brewerton Channel; on the part of the Columbia against the Reeder, that the tug was not in command of a competent pilot, master, or other person, that it failed to keep a good lookout, that it was towing on a hawser of unusual length, that it failed to keep itself and the barge to the starboard or right-hand side of the fairway, that it failed to keep the barge under control, and permitted it to be towed into the steamer, and that it gave an improper signal of one blast to pass the Columbia port to port, having shortly before passed the Florida starboard to starboard; and on the part of the Columbia against the Vane, that it permitted itself to be towed on a hawser of unusual length, and failed to steer properly after the tug. The Reeder in its cross-libel charged that the Columbia was without proper steering gear, and not properly equipped and manned, that she failed to keep the side of the channel which lay to the starboard of mid-channel, that she was running at an unreasonable rate of speed at and until the collision, and failed seasonably to stop and reverse, or otherwise meet the burdens imposed upon her as the unencumbered vessel meeting a tug and tow under the circumstances she did, and that she failed to keep out of the way of the tug.

Daniel H. Hayne, of Baltimore, Md., for the Howard Reeder.

Arthur D. Foster, of Baltimore, Md. (John Henry Skeen, of Baltimore, Md., on the brief), for the Columbia.

H. N. Abercrombie, of Baltimore, Md., for the Elizabeth E. Vane.

Before PRITCHARD, Circuit Judge, and WADDILL and Mc-DOWELL, District Judges.

WADDILL, District Judge (after stating the facts as above). The averments of fault thus stated by the vessels against each other are many in number, but when considered in the light of the testimony and the findings of fact of the lower court it will be found that but few of them are meritorious. Those against the barge were entirely withdrawn at the trial, as were those of the steamship against the tug, and the tug against the steamship, that they were not each properly

manned and equipped; at all events, no evidence to that effect was introduced by either side. The averment as to the failure of the Columbia to have proper steering gear, certainly at the time of the collision, was not established.

What is said of the number of averments of fault largely applies to the assignments of error, especially those of the tug, some 39 in number. The case is a simple one of a collision between an incumbered and an unincumbered vessel, namely, between a fast passenger steamer and a barge in tow of a tug in a straight channel, certainly as much as 600 feet wide at the point of collision, after the vessels had seen and observed each other for several miles, and had interchanged passing signals when a mile or more apart. The collision occurred in the Brewerton Channel, at a point about opposite buoy No. 26; and before the Columbia had come into the Brewerton Channel from the Ft. McHenry Channel she had observed this tug and tow coming up the Brewerton Channel near where it intersects with the Cut-Off Channel, a distance of more than four miles; that after rounding into the Brewerton Channel from the Ft. McHenry Channel, at or near buoy 30, she observed the tug and tow proceeding up the channel; that the distance from the entrance to the Brewerton Channel to the point of the collision was between a mile and a quarter and a mile and a half; that shortly after coming into the Brewerton Channel, she received a signal from the Reeder, which was then showing its red light, of one whistle, to pass port to port; that the Columbia for the moment failed to respond to that signal, and upon its being repeated by the Reeder, the Columbia replied with one blast, accepting the proposed maneuver to pass port to port, and promptly ported her wheel with a view of so passing, and continued to navigate at the speed of 12 knots an hour until she passed abreast of the tug some 150 feet, and sheered and ran into the barge, causing the injuries sustained.

The Brewerton dredged channel was 600 feet wide and 35 feet deep, and at the point of the collision there was in addition water to the southward of from 18 to 20 feet deep for approximately 100 feet, making 700 feet of navigable water.

The Columbia's contention is that, having received the signal to pass port to port, she had the right to assume that the tug and tow was to the starboard hand of mid-channel, and that there was no necessity for her slackening speed; and that she found, as a matter of fact, that the tug and tow was to the southward of mid-channel, which caused the Columbia, in passing, to go so near to the southward side of the channel as to cause her to sheer and run into the barge.

[1] The main findings of the lower court are substantially as follows: (a) That the collision occurred to the southward of mid-channel, the tug being slightly and the barge about 100 feet therefrom; (b) that the Columbia was approximately half a mile from the scene of the collision when the passing signals were exchanged; (c) that the time the collision actually occurred was not 7:35, as contended for, but 7:41; (d) that the steamer Florida, which passed the tug and tow starboard to starboard on a signal inaugurated by the Florida,

did not pass at the intersection of the Brewerton Channel with Cut-Off Channel, some 2⅛ miles below the scene of the collision, as claimed by the Reeder, and in effect testified to by the Florida's master, but about three-fourths of a mile below the scene of the collision. And the court endeavored to establish each of these positions largely by mathematical demonstration.

In the view this court takes of the case, assuming these findings of fact to be correct, its judgment in the final result would not be materially affected thereby, though we do not concur in the judgment of the court below as to most of them, and do not appreciate the materiality of some of them; for instance, whether the collision occurred about 7:35, as contended for by the Reeder, or 7:41, as calculated by the court below. The evidence is not expected to be entirely accurate on a matter of fact of this kind, occurring on a dark and misty night, as many of the witnesses testified it was, though they admitted there was no difficulty in seeing a vessel's lights. Nor is it really material just how the Florida passed the tug and tow, whether starboard to starboard or port to port, since upon the court's showing it was three-quarters of a mile below where the collision occurred. The Columbia was charged with the duty of avoiding a collision with this incumbered tug and tow, that was in full view; and she had no right to govern her movements by what another steamer did a mile and a half away, as shown by the court, and very much further below, as claimed by the Reeder. Where, in the channel, the collision happened, is a matter of some moment, and one which, while we are not unmindful of the weight justly to be given to the findings of fact of the lower court, who saw and heard the witnesses, as respects this particular finding, very important testimony was introduced by depositions. Therefore, as to that, the lower court had not the full advantage of seeing the witnesses; and it appears to us that the preponderance of the testimony establishes that the tug, in order to insure a safer navigation, was gradually making its way to the northward line of the channel, on which was the line of buoys, and at the time of the collision the tug was somewhat to the northward of, and the barge approximately in, the middle of the channel, and at the time of accepting the passing signal the Columbia was navigating slightly to the northward of mid-channel for the purpose, also, of directing her course by picking up the buoys on that side, and at that time ported with a view of passing the tug and tow port to port, and at the time of collision she, too, was also approximately about mid-channel. This is shown by the position of the wreck in the channel, the range lights marking the midway of the 35-foot channel, the admission of the Columbia's master as to the location of the wreck, the evidence of the wrecker and others who examined and measured the grounds, and of the navigators of other vessels passing by the spot where the collision occurred. As to the time of the exchange of passing signals, while the court heard all the witnesses respecting that matter, still it does not seem very positive in its findings on the subject, as it says:

"The Columbia at the time of the interchange of signals would have been at most a trifle over half a mile from the point of collision. Many witnesses

think that there was a longer interval between the sounding of the one blast, the signal by the Reeder, and the collision."

Then, after giving certain calculations respecting the time of the collision and the location of the buoys, based on the testimony of the Reeder's master, the court says:

"I believe there was much less time between the interchange of the signals and the collision than many of the witnesses supposed. What happened after they were interchanged can be more easily understood upon the assumption that the time was very short."

It seems to us, while, as above stated, not essential to the determination of this case upon its merits, that the lower court is certainly mistaken as to the distance that the two vessels were apart at the time the Columbia accepted the Reeder's signal; and in the most unfavorable view to the tug, they were over a mile apart, which is borne out by the almost undisputed testimony of the witnesses, including those of the Columbia. The master of the Columbia gave the distance at about a mile and a half; her second officer, while not naming a specific distance, clearly showed, having regard to the place of giving the signal, that it was more than a mile away; her quartermaster, at from a mile and a quarter to a mile and a half; and her outlook, that the passing signal was given a little above buoy 28, which certainly places them considerably more than a mile apart, the collision itself having occurred off buoy 26. The master of the tug fixes the same distance as a little over a mile, and the master of the barge that the signal was given as the Columbia straightened down the Brewerton Channel, and that the second signal was given in' a few seconds, and promptly answered by the Columbia, which would place the vessels considerably over a mile apart.

We have made this reference to the evidence in order to show the different viewpoints from which the testimony may be considered; but, as before stated, even upon the findings of the lower court, having regard to the rules of navigation applicable at the time of the collision, there can be but one conclusion in this case, namely, that the Columbia is responsible for not avoiding the collision with this barge under the circumstances here. There was nothing in the condition of the weather to make navigation difficult, further than it was a dark, misty night. Lights could be seen, and were seen, for several miles; the vessels were approaching each other on a straight course, end on, or nearly so; the channel not obstructed; neither wind nor tide were disturbing elements; and at the time, with a channel of 600 feet of deep water, marked with spar buoys on its northern side, and 100 feet of water additional at the scene of the collision of depth more than ample for the purposes of both vessels. The tugboat was undoubtedly the incumbered and favored vessel; the Columbia was the burdened vessel; and she cannot escape responsibility for omission to conform either to the rules of navigation, or to take such steps as good seamanship required of her, carrying the burden with which she was charged, by attempting to throw suspicion or doubt upon the acts of others; nor will she be permitted to rely upon what she presumed the incumbered vessel could or ought to have done. In fact,

the presumptions of fault are against her, rather than otherwise, for a collision occurring under the circumstances of this case.

Upon the lower court's finding, she accepted the signal of the tug given nearly a mile away to pass port to port. Hence she had ample time, had she exercised the prudence required of her, not only to have avoided collision with the barge, but any risk thereof. She could have initiated the passage signals, and taken either side of the channel she wanted to, and with her searchlights playing upon the buoys to the one side, and the tug and tow in or near the center of the channel, there was no difficulty in her determining what course she should pursue, and if difficult, or if she misunderstood the tug's signal, then her course was simple. She should have given danger signals, and stopped until she found out what was safe to do, and, in the then conditions, should certainly not have proceeded at 12 knots an hour, without absolutely knowing the position in the channel of the tug and tow. Upon the court's finding, there was 200 feet of 35-foot depth of water within the channel, and also 100 feet of sufficient depth for her to have passed over in safety, had she prudently navigated with respect to her speed, which she did not do. The Columbia was presumed to know the depth of the channel, of the existence of the deep-water channel and its width, of the difference in the draft of the ship, in running at high or low speed, and of the danger of sheering in passing in too close proximity to the banks. Whether this collision occurred because of the Columbia's sheer, from running too close to the channel's banks, or because, while running at such speed, she put her wheel hardaport and suddenly reversed, and from the kick incident thereto, is utterly immaterial, since in either event the sheer was caused by the excessive rate of speed of the Columbia at a time when prudence required that she should have slowed down. Without such sheer there manifestly could have been no collision in 300 feet of clear channel way. The Columbia's navigator should not have waited to slow down until she was abreast of the tug, as he admits he did, and until his vessel, as he says, began to "run," as he calls it, or sheer from the bank. She was at the time only some 450 feet away from the barge, and manifestly the effort to check her speed, then for the first time made, was too late to accomplish any real good. Good seamanship required that she should have anticipated danger in such a maneuver, and for the consequences arising therefrom she can neither escape responsibility nor justly call upon others to share her losses. Authorities to sustain the views herein expressed might be cited almost without number, and only a few need be given. The Syracuse, 75 U. S. (9 Wall.) 672, 674, 19 L. Ed. 783; The America, 92 U. S. 432, 437, 438, 23 L. Ed. 724; The New York, 175 U. S. 187, 201, 207, 20 Sup. Ct. 67, 44 L. Ed. 126; The Ohio, 91 Fed. 547, 548, 551, 33 C. C. A. 667; The Caldy (D. C.) 123 Fed. 802, 806; The Georgetown (D. C.) 135 Fed. 854; The Westhall (D. C.) 153 Fed. 1014; The Maryland (D. C.) 182 Fed. 829, 831.

[2] The master of the steamer indicates in his testimony that, on receiving the signal to pass port to port, he assumed that the tug would give him the south half of the channel; and counsel for the

Columbia seek to maintain this position in argument, namely, that the Columbia had the right to the southern half of the channel, and the additional right, upon receiving the signal to pass port to port, to consider the same clear. This, we do not understand to be the law. Article 25 is that:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

That it would be best to have vessels so navigate—that is, each proceed to the right—is very clear, if it could in all cases be done, and would largely obviate the necessity of passing signals at all in channels of the character in question. But the rule is when it "is safe and practicable so to do," leaving it largely a matter of discretion to the navigator, made necessary by many considerations which arise en route, among them the necessity for crossing from side to side of the channel, the existence of shoal waters, the sinuosities of the channel, leaving or approaching a channel, and the following of buoys or other aids to navigation on dark nights. This case shows the difficulty of conforming strictly to this rule. Not one of the vessels mentioned in connection with this accident, was pretending to conform to the rule, save the tug Reeder and its tow, which was navigating gradually to the northward side of the channel. The Columbia, as found by the lower court, at the time of receiving the first signal from the tug, was coming down the river, to the northward, instead of the southward, side of the channel; and the Florida's master admits that he was within 50 feet of the bell buoy on the north side of the channel when he passed the same into Cut-Off Channel, and at the time the tug and tow insists it was then rounding its way into the channel, and when the Florida gave the Reeder a signal to pass green to green. Clearly, the inland rules of navigation give no countenance to such contention, namely, that on receiving a passing signal each vessel has the right to assume that the other is on a particular side of the channel, or will make room for the approaching vessel on the other side. On the contrary, certainly between an unincumbered and an incumbered vessel, such condition could not well exist, and as between them the unincumbered or free vessel is the burdened one of the two vessels. The incumbered vessel should not embarrass the free vessel, it is true, or do anything to obstruct its navigation. But when it has duly signaled to a free ship, giving notice of its presence, and the character of its burden, as was done here, and the same was known by the latter, and the maneuver inaugurated by the tug, accepted by it in ample time for each ship to control its movements, the incumbered vessel discharges its full duty, in the absence of some unusual emergency, by proceeding on the course indicated by it, and acquiesced in by the ship; that is, as is certified to by the lower court as a fact, by navigating gradually to the northward, and away from the course of the Columbia. Under the circumstances of this case, to require more would in effect be to shift the burden of responsibility from the unincumbered to the incumbered vessel.

No rules of navigation are more important than these under consideration here, and to lessen or in any way alter the burden placed upon vessels to so navigate in narrow channels as to pass each other in safety, after giving and accepting signals so to do, by any such idea or notion that either vessel may do what it chooses, or take as its own the one-half of the channel on the side it happens to be navigating, would be unfortunate in the extreme.; indeed, would in effect do away with and destroy the rules entirely. In this case, the presence of the tug and tow, ascending the channel, was known of when it was several miles away, the agreement to pass port to port made when a mile or more away, and the free vessel directed its course to port, but did nothing more, and continued at the speed of 12 knots an hour in the dark, passing the tug only by a margin of 150 feet, when it sheered and caused the collision. The sheer confessedly would not have occurred, but for the speed; and this alone, in the court's view, brought about the accident, and the ship cannot escape liability because of alleged unforeseen and whimsical occurrences in connection with its navigation, which good seamanship and ordinary prudence and foresight would have anticipated and provided against. The Syracuse, 76 U. S. (9 Wall.) 672, 675, 676, 19 L. Ed. 783; The Saratoga (D. C.) 1 Fed. 730, 733; The Britannia (D. C.) 34 Fed. 546, 557, 558, and cases cited; The Portia, 64 Fed. 814, 12 C. C. A. 427; The Georgetown, 135 Fed. (D. C.) supra, 854, 859; The Westhall, 153 Fed. (D. C.) supra, 1014, 1016; The No. 1, 180 Fed. 969, 973, 104 C. C. A. 125; The Ralph Cregke, 4 Asp. Mar. Cases, 19; Coyzer v. Carron Co., 9 App. Cas. 873, 883.

It follows from what has been said that the Columbia should be held solely responsible for bringing about the collision in question, and that the decision of the lower court, holding the Reeder and Columbia both in fault, and apportioning the damages between them, should be reversed, at the cost of the Columbia, the cross-appellant; and it will be so ordered.

Reversed.